## Louisville & Nashville Railroad Company v. Smith.

(Decided May 28, 1912.)

### Appeal from Knox Circuit Court.

Damages—Verdict Awarding Excessive, Set Aside.—In an action to recover damages for personal injuries, where it appears from the evidence that the complaining party was not seriously or permanently injured, a verdict assessing the damages at $4,300 will be set aside upon the ground that it was given under the influence of passion or prejudice.

BENJAMIN D. WARFIELD, CHAS. H. MOORMAN and BLACK, GOLDEN & OWENS for appellant.

J. M. ROBERSON, J. F. CATRON for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

The appellee Smith, claiming to have received injuries by the derailment of a train on which he was riding as a passenger, brought this suit against the appellant company to recover damages and upon a trial before a jury was awarded $4,300.

Several grounds for reversal are relied on, but we do not think any of them are sufficient to authorize a reversal except the one based on the assignment that the verdict is excessive, and to this ground we will confine the opinion.

That a passenger train operated by the appellant company was derailed near Hazel Patch, in Laurel County, in August, 1909, is not denied, and there is sufficient evidence to show that its derailment was caused by the unsafe and defective condition of the track, in connection with the high speed at which the train was

running. So that, if appellee was a passenger on the train, and received injuries as a result of the wreck, he had a good cause of action against the company to recover damages for the injuries sustained.

It is strongly contended by counsel for appellant that appellee was not a passenger on this train, or injured in the wreck, and there are many facts and circumstances that support this theory of the case. But, the testimony of appellee, although unsupported, was sufficient to take the case to the jury upon the question that he was a passenger and injured in the wreck, and, if these were the only issues in the case, we would not feel justified in setting the verdict aside, although the weight of the evidence favors decidedly the appellant's view of this matter.

Coming directly to the amount of damages, appellee, who is a man about 58 years old and deaf and dumb, testified that after extricating himself from the wreck, which occurred on Thursday about one o'clock in the afternoon, he took a seat on the side of the track and rested for about fifteen minutes, and then started to and did walk home, a distance of about 37 miles over a mountainous rough country, arriving at his home in Knox County late the following Saturday afternoon. He further said in substance that his bowels, chest, arms and head were hurt; that he spit up blood for about two days and passed blood from his bowels for about two weeks, and was in bed several weeks, and that his health had not been good since the accident. That he suffered at times from the accident up to the date of the trial, some two years afterwards, and had not been able to do a great deal of work since he was injured. In these statements he was corroborated only by his daughter, Mollie Smith, who lived with him at his home.

John McWilliams, an acquaintance of appellee, and who lived in Knox County, testified that on Saturday about noon the appellee came to his house and "It seemed like he was in trouble, or hurt, or something; I kind of motioned to him, and he run up his sleeve that way and showed me his arm; and by this time Reed Hughes come out and sat down, and then he wrote on the paper to Hughes and showed us his arm. Q. Describe the condition of his arm? A. His arm was skinned—not so bad skinned as it was bruised, and had a skinned place on his elbow. Q. What was the color? A. A blackish or blue-looking

color. Q. Where was the blue and black color on his arm? A. It was somewhere along here on his arm, and on his elbow here. He did not seem to pay as much attention to that as he did to his side some way here.''

Reed Hughes said that he saw him before he reached McWilliams' house, and that: "He was carrying one of his arms sort of with his other hand, like that.'' Asked to describe his condition when he saw him at McWilliams, he said: "I saw his arm was bruised up; his arm looked like it had been bruised by a fall or a mash or something; the hide was not broken as I could see, but it was bruised. Q. What was the color of the arm? A. It was a kind of red, angry, blue spot on it.''

These witnesses who were the only ones offered by appellee on the point we are considering were asked to relate what appellee said to them about the character and extent of his injuries and how they were received, but the court properly sustained objections to this evidence.

Dr. Crit Jones, who lived a few miles from appellee, in Knox County, and who was introduced as a witness for the railroad company, testified that in the early part of August, 1909, appellee came to his house and he made an examination of him. He was asked:

"What did you find. A. I couldn't find nothing external, only discoloration of the skin on his bowels, and swollen wrist. Q. Which wrist was swollen? A. The left wrist as well as I remember. Q. Where were the bowels discolored? A. On the left side. Q. What was the extent of that? A. Just simply a discoloration of the skin. Q. Did you examine him for internal injuries? A. Yes. Q. How long was he with you? A. I guess he stayed an hour and a half. Q. Did he complain to you or did you discover any injury to his chest? A. Not at all. Q. Or spitting of blood? A. No, sir. Q. Or any passing of blood? A. Nothing of that order. Q. Taking the condition you found him in, what in your opinion was the result of that as to incapacitating him for labor, and if so, how long? A. Well, of course, he came through afoot and walked off afoot; and, if a man could do that, he could work some, but I don't know whether it would amount to anything or not. Q. How soon in your opinion would that condition repair? A. In four or five days. Q. Did you treat him any further after that? A. That was all. Q. Did he call on you any more? A. That was the only time.''

Dr. G. H. Albright, a physician living in Barbourville, introduced as a witness for the company, said that on the 17th of September, 1909, the attorney for Smith called on him to go and see appellee, who was then in the town of Barbourville. He was asked:

"What time of day did you see him first? A. It was after dark when I went up to his house. Q. Did any one go with you? A. No, I think not. Q. Now, tell what you saw and found on that occasion or any occasion when you examined him or treated him? A. Well, it was after night, by lamp light; I went up and made a little examination that night in there, and he spoke of being in a wreck and that he was injured in the abdominal cavity, and that he wanted me to treat him, and had come down for that purpose; so, I couldn't find from my examination that evening any indications of any trouble. Q. What was he complaining with? A. He was complaining with his bowels running off; said he had diarrhoea from the effects of the wreck he was in; so, after I couldn't find anything indicating any trouble, I gave him a little diarrhoea tablet and told him to take that and I would come back next morning at daylight and give him a thorough examination. So I came back next morning, and did go over him thoroughly. I couldn't find any indications that he had any trouble. So this diarrhoea tablet had caused his bowels to move, and I advised him to take a dose of castor oil; and I have never heard from him since. Q. Describe to the jury the examination you made. A. Well, he was in the room there, and I had him to lie down on the bed and remove his clothing over the abdominal cavity and first inspected the parts to see if I could find any abnormal condition. Q. Did you find any? A. I did not. Then I used percussion to see if the organs all seemed to be in proper position, and palpitation that we go through with to find out any abnormal condition, and I was unable to find it. Q. Can you state from anything you discovered that he actually had bowel trouble at all? A. No, I only took his word for it. Q. I would like to ask you whether or not he complained of any injuries to his lungs, or his head or arms? A. No, sir, it was all in the abdominal cavity. Q. Now, from your knowledge of treating persons afflicted like himself with inability to speak or hear, and from the examination you made to find the injury, I want you to tell the jury whether or

not in your opinion he had received any injury? A. It is my opinion that he had not received any."

These doctors, as well as others who were introduced as experts, testified that if appellee had received the injuries he testified to, he could not have walked from the wreck to him home as he says he did.

It is so apparent from this evidence that the verdict is outrageously disproportionate to the injuries received that we have no hesitation in setting it aside under section 340 of the Civil Code authorizing us to grant new trials when "excessive damages appearing to have been given under the influence of passion or prejudice" have been awarded.

Wherefore, the judgment is reversed, with directions for a new trial in conformity with this opinion.